FILED
2016 Jul-06  AM 10:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **BLACK DIAMOND LAND MANAGEMENT, LLC,** } } } | |
| **Plaintiff,** } } | |
| **v.** } } | **Case No.:  2:14-cv-02333-RDP** |
| **TWIN PINES COAL COMPANY, INC., et al.,** } } } | |
| **Defendants.** } } | |

**MEMORANDUM OPINION**

## I.   Introduction

Plaintiff filed this action in December 2014, and has since amended its complaint twice. The parties and court are still at this late date litigating whether the pleadings state a plausible claim.  However, the protracted nature of this litigation is not surprising given the fact that the property interests in dispute have intersected (or overlapped) with litigations that took place in Jefferson County Circuit Court (Bessemer Division) for approximately ten years between certain non-parties to this action—U.S. Steel Corporation, Gerald and Mary Boothe, and Willie and Mondez Haire.[1]  (Doc. # 84 at 5); *see also U.S. Steel Corp. v. Boothe*, No. 04-cv-1235 (Ala. Cir. Ct. Jefferson Cty., Bessemer Div. 2004); *U.S. Steel Corp. v. Boothe*, No. 04-cv-1235.01 (Ala. Cir. Ct. Jefferson Cty., Bessemer Div. 2004); *U.S. Steel Corp. v. Boothe*, No. 05-cv-453 (Ala. Cir. Ct. Jefferson Cty., Bessemer Div. 2005); *U.S. Steel Corp. v. Haire*, No. 09-cv-127 (Ala. Cir. Ct. Jefferson Cty., Bessemer Div. 2009) (Docs. # 43, 45); *U.S. Steel Corp. v. Haire*, No. 09-cv-

---

[1] U.S. Steel also litigated against Plaintiff in the same suits it prosecuted against the Haires.  *See U.S. Steel Corp. v. Haire*, No. 09-cv-127 (Ala. Cir. Ct. Jefferson Cty., Bessemer Div. 2009).

127.01 (Ala. Cir. Ct. Jefferson Cty., Bessemer Div. 2011) (Doc. # 49).  The court's purpose in referencing these state court cases is not to suggest in any way that these litigations resolved Plaintiff's claims that it has become the rightful owner of any real property or mineral rights in dispute.  Rather, these cases help to put in proper context exactly what is in dispute here.  And, what is really in dispute here is <u>not</u> whether Defendants have violated RICO, the Lanham Act, or the Sherman Act.  No, the crux of the dispute between these parties is a legally straight forward (though perhaps factually complex) state law question: which side has a legal claim (or the superior legal claim) to the property interests at issue here.[2]

---

[2] Plaintiffs appear to concede that Defendants may have legal title and rights to land and mineral rights as reflected in various deeds, leases, court filings, and court decisions throughout Alabama. But Plaintiff contends that that title and those rights are based on errors going back over, in some instances, 150 years.  As Counsel for Plaintiff stated at the April 5, 2016 oral argument:

> The property goes back – to properly ascertain, if we get to a summary judgment or trial standard, who has the greater ownership interest in the coal and the timber, you literally have to go back to the 1850s when the land first came into the Alabama land system.  And through a series of assignments, through a series of leases, through a series of mergers and acquisitions and a host of other transactions over a 150-year period, you get to, at the end of a long discovery process, and complex – Judge, we've been working with experts.  I'm going to tell you, just experts alone and then I'm going to come back and make some other points, just to respond to what they're saying.

> It's not as simple as coming with a deed.  A deed won't decide this case.  It's not as simple as coming with one lease.  You're going to need mineral rights and coal title experts.  You need land surveys.  That's what we're working with now, and told us what all we need.  You're going to need timber rights experts.  You're going to need a title expert for timber rights.  Some financial experts.  It's a team that has to be assembled, and we're working on that.

> So, to answer your question, a land title deed alone does not decide this question.  And so the state court order is a piece of information.

> THE COURT: I understand what you're saying, but my question is a little different, though.  Ultimately, through the use of experts, fact witnesses, records, you will have to show, in order to show injury and that you're entitled to recover, that they have been extracting mineral rights, minerals, coal, or timber that belonged to your client.

> MR. WATKINS: Yes. When we get past the motion to dismiss, if we get past that, yes, we do have to establish that by evidence, the exact times and date of extraction, how much they got, where exactly they got it from.  That's a matter of discovery.  Those records are within their unique knowledge, control, and dominion.  We don't have access to that.

(Doc. # 84 at 18:1 – 19:12).  Whether the legal title and rights to land and minerals at issue are based on error stemming from the 19th Century is not a matter properly determined under RICO, the Lanham Act, or the Sherman

This case is before the court on Defendant Drummond Company, Inc. ("Drummond")'s Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. # 49), filed October 7, 2016; Defendant Molpus Timberlands Management ("Molpus")'s Motion to Dismiss or in the Alternative, Motion for Summary Judgment (Doc. # 50), filed October 7, 2016; Defendant Twin Pines Coal Company, Inc. ("Twin Pines")'s Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. # 51), filed October 7, 2015; Defendant Valley Creek Land & Timber, LLC ("Valley Creek")'s Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. # 59), filed October 30, 2015; Intervenor-Defendant RGGS Land & Minerals, Ltd., L.P. ("RGGS")'s Motion to Dismiss (Doc. # 73), filed November 5, 2015; and Defendant SFW Birmingham, LLC ("SFW")'s Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. # 76), filed December 4, 2015.  The Motions are fully briefed.  (Docs. # 49, 50, 51, 56, 59, 62, 63, 67, 70, 72, 73, 76, 79, 80, 81, 82).  On April 5, 2016, the court heard oral argument on the Motions. (Doc. # 84).  Subsequently, the parties submitted post-hearing briefs.  (Docs. # 86, 87).  After careful review, and for the following reasons, Defendants' Motions are due to be granted in part as to Plaintiff's federal claims, and the state law claims are due to be dismissed under 28 U.S.C. § 1367(c).

## II.     Background Facts[3]

Plaintiff is an Alabama corporation located in Birmingham, Alabama.   (Doc. # 48 at ¶ 3). It purports to be the successor in interest of Southern Iron & Steel (which was chartered on December 12, 1898, by the Alabama Legislature).   (*Id.*).   Defendants are either Alabama

---

Act.  Likewise, it is not an issue that gives rise to an independent basis for federal jurisdiction.  It is a matter properly decided by the state courts.

[3] The facts are gleaned from the allegations in Plaintiff's Second Amended Complaint (Doc. # 48), which the court views in the light most favorable to Plaintiff.  *See Watts v. Fla. Intl. Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

corporations or out of state limited liability companies and partnerships, which are registered to do business in Alabama.[4]  (*Id.* at ¶¶ 4–8).  In summary, Plaintiff alleges that Defendants: (1) without receiving authorization or providing financial compensation, wrongfully extracted timber and coal owned by Plaintiff (*see* Doc. # 48); (2) misstated and misrepresented the facts regarding the origin of those resources by labeling them with Defendants' own logos or symbols, and selling and exporting them (*id.*); and (3) refused to share any profit with Plaintiffs.  (*Id.*). There has previously been substantial litigation over property rights which were conducted in state court.  More specifically, U.S. Steel sued Plaintiff in state court at an unspecified time, and an order was issued establishing boundary lines.  (Doc. # 48 at ¶ 9).  Plaintiff alleges no further information concerning that order or those boundary lines.[5]  Plaintiff avers that past state court litigations over land disputes do not bar these claims because Plaintiff's claim of ownership rights over minerals and natural resources is an issue separate and distinct from the ownership of the surface land.  (*See id.*).

On August 2, 2010, Twin Pines authorized a pre-blast survey of what Plaintiff alleges to be its premises.  (Doc. # 48 at ¶ 10).  On August 25, 2010, Plaintiff sent a letter of ownership to Twin Pines, followed by an October 7, 2010 letter accusing Twin Pines of commercially exploiting Plaintiff's ownership of natural resources.  (*Id.* at ¶¶ 11–12).

Additionally, Plaintiff avers that Drummond and Twin Pines, acting as an enterprise, conducted coal mining operations underneath Plaintiff's property without its permission but under the guise of state permits.  (Doc. # 48 at ¶¶ 21–23, 27–29, 35).  These mining operations were prefaced by Drummond sending Plaintiff blasting notices on December 19, 2011, and

---

[4] For example, RGGS is a Delaware limited partnership based in Houston, Texas.  (Doc. # 69).

[5] Plaintiff attached documents to its initial Complaint that purportedly came from the case, but does not make reference to them in the Second Amended Complaint.  (*See* Doc. # 1-1).

December 26, 2012.  (*Id.* ¶¶ 22–23).  Further, Plaintiff alleges that on June 11, 2012, Drummond met with it concerning Drummond's interest in acquiring ownership of its natural resources.  (*Id.* at ¶ 24).  Subsequently, on July 18, 2012, Plaintiff sent Drummond a letter concerning another meeting and a possible sale of mineral rights.  (*Id.* at ¶ 25).  Plaintiff sent another letter on March 21, 2013, and included a contract for the purchase of its natural resources.  (*Id.* at ¶ 26).  It avers that Drummond and Twin Pines conducted blasting and coal extraction throughout this time.  (*Id.* at ¶ 27–29).

Similarly, Plaintiff avers that Molpus, SWF, and Valley Creek received state permits and conducted multiple commercial timber operations on Plaintiff's land without its permission. (Doc. # 48 at ¶¶ 16, 36).  Plaintiff further alleges that these Defendants sold Plaintiff's timber, without its authority, in an amount exceeding $10,000.  (*Id.* at ¶¶ 17–18).

Based on these allegations, Plaintiff asserts federal causes of action against all Defendants for violations of (1) Section 43 of the Lanham Act, and (2) RICO based on 18 U.S.C. §§ 1952, 1953, 2314, and 2315.  (*See* Doc. # 48 at ¶¶ 30–34, 37–44, 48–57, 79–87). Additionally, Plaintiff alleges state law claims against all Defendants sounding in conversion, negligence, and civil conspiracy.  (*Id.* at ¶¶ 58–66, 73–75).  Plaintiff also has sued Drummond and Twin Pines alleging violations of the Sherman Act (15 U.S.C. §§ 2 & 3) and claiming that they conspired together to monopolize coal commerce within and without Alabama, thereby preventing Plaintiff from accessing and exercising dominion over its own coal, including by prohibiting competition.  (*Id.* at ¶¶ 45–47, 67–72).  Finally, pursuant to the Declaratory Judgment Act, Plaintiff requests a declaration concerning: (1) its ownership rights and privileges to minerals and other natural resources at issue; and (2) its rights to the natural resources below the

surface of the land where Defendants are conducting mining operations, as well as a determination of Plaintiff's timber rights. (*Id.* at ¶¶ 76–78).

Nowhere in the Second Amended Complaint does Plaintiff provide a description of its alleged property and the boundary lines decided in the referenced state court action. Likewise, the Second Amended Complaint does not describe how Plaintiff purportedly owns the coal and timber it claims have been taken (and are still being taken) by Defendants. And, Plaintiff does not allege facts concerning the creation of any enterprises or conspiracies, including any overt acts. Finally, Plaintiff has not attached any documents to the Second Amended Complaint.

## III.   Procedural History

Plaintiff filed its initial Complaint on December 4, 2014, against only Molpus, Drummond, and Twin Pines, and requested only a declaratory judgment. (Doc. # 1). Plaintiff attached copies of deeds and blasting notices, and other documents, to that Complaint. (Doc. # 1-1). The Defendants filed initial motions to dismiss, arguing that this court lacked subject-matter jurisdiction and that Plaintiff failed to state a claim. (Docs. # 8, 9, 15). Subsequently, Plaintiff filed its First Amended Complaint for Declaratory Judgment against the same three Defendants. (Doc. # 19). It did not contain any attachments. (*See id.*). The court ordered the parties to confer face-to-face concerning the property allegedly at issue. (Doc. # 25). On March 17, 2015, the parties filed a Joint Report on Parties' Meeting.[6] (Doc. # 26). The Defendants then

---

[6] In the report, the parties stated that the "nucleus" of Plaintiff's "interest in the land stems from the Interstate Commerce Act, a 1912 U.S. District Court case, and the documents attached to the Complaint," but that Plaintiff "did not present any contracts or leases at the meeting showing its right to a royalty in the timber and minerals being claimed in this lawsuit." (Doc. # 26 at 2). The Defendants detailed a history of their ownership of various properties and mineral rights at issue, and reported that they presented maps, deeds, and leases at the conference, and stated that other non-parties have purchased some of the land and mineral assets purportedly at issue. (*Id.* at 3–7). Plaintiff subsequently made a second presentation at the meeting of its claims for ownership of the lands and minerals, and "confirmed that the documents that serve as the basis of [its] claim are all contained in the exhibit attached to the original complaint, pages 7–14 of Document 1-1." (*Id.* at 8). Those documents are: "(1) a document created by [Willie] Haire [Plaintiff's owner] called 'Final Order of Court May 8, 2011' that was later

filed a second round of motions to dismiss.  (Docs. # 23, 29, 30).  The case was delayed when Plaintiff changed attorneys and retained the present counsel.

On September 23, 2015, Plaintiff filed its Second Amended Complaint, naming additional Defendants and claims, as further set forth above. (Doc. # 48). Defendants subsequently filed their respective motions to dismiss pursuant primarily to Federal Rule of Civil Procedure 12(b)(6), which the parties have fully briefed.[7]  (Docs. # 49, 50, 51, 56, 59, 62, 63, 67, 70, 72, 73, 76, 79, 80, 81, 82).  The court heard oral argument on the Motions on April 5, 2016. (Doc. # 84).  At oral argument, Plaintiff implored the court that it was researching chains of title and other ownership information with an expert as quickly as possible, and argued that its case should remain in this court at least through discovery.  (*Id.* at 17:10–19:12, 24:7–25:22). Defendants contend that this case is essentially a cloud on their title and is due to be dismissed. (*Id.* at 42:11–45:12).  The parties submitted post-hearing briefs addressing cases cited at oral argument, and furthering their assertions.  (Docs. # 86, 87).

Each Defendant has moved to dismiss the claims against it.  The court addresses the grounds asserted for each Defendant's motion to dismiss, in turn.

## A.       Drummond's Motion to Dismiss

Drummond argues in its Motion to Dismiss Plaintiff's Second Amended Complaint that Plaintiff does not, "even in vague terms," describe the property at issue, state what rights (if any) it has to bring this case, and has not shown it has any ownership rights.  (Doc. # 49 at 3). Accordingly, Drummond states, it cannot attempt to answer the Second Amended Complaint without any description of or reference to the property and location of the subject natural

---

stricken by order from the Probate records; (2) a document created by Haire called 'Amendment' that was filed on September 26, 2012; and (3) an October 7, 2009 deed from Willie Haire to" Plaintiff.  (*Id.*).

[7] During this time, RGGS intervened and filed its dismissal motion.  (*See* Docs. # 61, 66, 71, 73).

resources at issue.  (Doc. # 49).  Drummond does not address any of Plaintiff's specific causes of action or claims.  (*See id.*).

In its uniform response to Drummond, Molpus, and Twin Pines, Plaintiff contends that those Defendants should be barred from addressing the elements of its claims since they did not do so in their initial motion papers.  (Doc. # 56).  It also argues that it had no duty to provide any documents of ownership to Defendants prior to filing its Second Amended Complaint, that discovery will reveal that interest in the resources at issue, and that expert reports will support it. (*Id.*).  Additionally, Plaintiff asserts it has requested but Defendants have "refused" to provide (outside of formal discovery and protective orders) "several critical documents," including Molpus's timber cutting and management agreement and a copy of Drummond's coal reservoir volume estimates for the Shannon Mines Area.  (*Id.* at 5).  Finally, and in summary, Plaintiff argues it has pleaded specific facts for each count, that there is no heightened pleading standard, and that the factual allegations (because they are viewed in the light most favorable to Plaintiff) are sufficient to suggest plausibility.  (Doc. # 56).  Plaintiff believes it is entitled to move past the motion to dismiss and conduct discovery, which it contends will reveal the property description and Plaintiff's ownership rights.  (*Id.*).

In reply, Drummond repeats that the basis of Plaintiff's claims against it is that it interfered with Plaintiff's possessory interests in alleged "natural resources" by mining and selling materials Plaintiff claims it owns.  (Doc. # 63 at 1).  Drummond spells out that the grounds for its motion are twofold: (1) the Second Amended Complaint is wholly devoid of any factual allegations that could put it on notice of what Plaintiff's possessory rights are or what property is actually at issue, and (2) due to the lack of description, Plaintiff lacks standing to bring claims against Drummond based on interference with those alleged interests.  (*Id.* at 1–2).

Drummond further argues that Plaintiff had the opportunity to exchange information in a face-to-face meeting with Defendants' counsel, and to state its claims in the first two versions of the complaint, but Plaintiff provided nothing beyond conclusory statements.  (*Id.* at 3–4).

**B.     Twin Pines's Motion to Dismiss**

Twin Pines's dismissal motion largely mirrors Drummond's Rule 12(b)(6) arguments, but also contends as follows:

> As acknowledged by Plaintiff's counsel in open court on August 5, 2015, Defendants have provided Plaintiff's counsel whatever information requested by them regarding Defendants' ownership or possessory rights in thousands of acres of property.  Plaintiff has, however, refused to reciprocate despite several recent oral and written requests to do so.  Specifically, Plaintiff has refused to identify any particular property for which it claims ownership or possessory rights adverse to those of the Defendants or to provide documentation supportive of any such claimed rights.  Without this basic factual information, the Defendants and the Court are literally "flying blind" in this litigation.

(Doc. # 51 at 2).  Also, Twin Pines (more expressly than Drummond) argues that Plaintiff lacks standing, because "[e]stablishing its ownership or possessory rights is essential for the Plaintiff to be able to claim that the Defendants' challenged conduct caused or threatened the Plaintiff with an imminent breach and injury."  (*Id.* at 3 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992))).  Twin Pines further argues that without any description or way of discerning Plaintiff's alleged rights, Plaintiff could not "have suffered an 'injury in fact' – an invasion of a legally protected interest which is . . . concrete and particularized."  (*Id.*).

Plaintiff has provided the same uniform response to Twin Pines as that given Drummond and Molpus.  (Doc. # 56). In reply, Twin Pines attacks Plaintiff's positions that ownership or possessory rights are an issue for discovery and that it has no obligation to provide Defendants with factual bases of its claims.  (Doc. # 70).  And, it asserts, the only documents that Plaintiff

previously provided at face-to-face meetings through which Plaintiff claimed any coal-mining royalty rights from Twin Pines were dated after Twin Pines ceased mining operations.  (*Id.*).

C.     **Valley Creek's Motion to Dismiss**

Similar to Drummond and Twin Pines, Valley Creek argues in its Rule 12(b)(6) motion that Plaintiff's claims are simply ambiguous statements of property ownership devoid of any supporting factual basis, and, thus, "do not raise a right to relief above pure speculation and guesswork." (Doc. # 59 at 2).  It analogizes to Alabama case law that a trespass cause of action requires the complaint to be "sufficiently certain as to the *locus in quo* to put the defendant on notice of same, and the description should not be misleading." (*Id.* at 4 (quoting *Elmore v. Fields*, 45 So. 66 (Ala. 1906), *abrogated on other grounds by DeStafney v. Univ. of Ala.*, 413 So.2d 391 (Ala. 1981))).  Valley Creek likewise analogizes that a claim for conversion requires the plaintiff to "have general or specific title to the property in question, and the possession or immediate right of possession" of the property.  (*Id.* (quoting *Hamilton v. Hamilton*, 51 So. 2d 13, 18 (Ala. 1951))).  It also characterizes Plaintiff's request for a declaratory judgment as substantively one for quiet title, which, by state statute, requires a complaint to contain a description of "the lands with certainty," and allegations of "the possession and ownership of the plaintiff." (*Id.* at 5 (quoting Ala. Code § 6-6-541)).  And, Valley Creek argues that regardless of the characterization of the causes of action, each claim is premised on the threshold issue of whether Plaintiff has a possessory interest in the property, and Plaintiff has not pled that interest with specific facts.  (*Id.*).  Finally, Valley Creek contends Plaintiff lacks standing.  (*Id.* at 5–6).

Plaintiff's opposition largely mimics its response to Drummond, Twin Pines, and Molpus.  (Doc. # 62 at 3–13).  In addition, it contends that Alabama case law demonstrates that it is sufficient to plead conversion by indicating that a defendant came onto property and took an

item away from that property. (*Id.* at 13–14 (citing *Crowe v. City of Athens*, 733 So.2d 447, 450 (Ala. Civ. App. 1999))). Plaintiff also argues that Valley Creek's citation to *Elmore* is distinguishable because that case took place during the era of demur practice (which was prior to notice pleading), and that Plaintiff has plead with sufficient notice here. (*Id.* at 2–3).

Valley Creek's reply in substance repeats its opening brief and defends its use of *Elmore* by arguing that its general holding is still true. (Doc. # 72).

### D.  SWF's Motion to Dismiss

In the Rule 12(b)(6) portion of its motion to dismiss, SWF sets forth arguments very similar to those made by Drummond, Twin Pines, and Valley Creek (and cite the same cases cited by Valley Creek). (Doc. # 76 at 2–5). In the Rule 12(b)(1) portion of its motion, SWF contends Plaintiff lacks standing because it failed to provide facts establishing its ownership or possessory rights. (*Id.* at 5–6).

Plaintiff in response "incorporates all arguments made in its Responses to . . . Twin Pines Coal; Drummond Company; Molpus Timberlands; Valley Creek Land [&] Timbers; and Intervenor RGGS." (Doc. # 80 at 1).

In its reply, SWF argues that none of Plaintiff's prior responses actually address the specific arguments made by SWF. (Doc. # 81 at 1–2). The remainder of the reply all but mirrors Valley Creek's reply brief. (*Id.* at 2–4).

### E.  RGGS's Motion to Dismiss

RGGS intervened "for the purpose of defending its title to coal and other mineral that it believes to be the subject of this action," and moves for an order under Rule 12(b)(6) dismissing Plaintiff's Second Amended Complaint. (Doc. # 73 at 1). RGGS argues that "Plaintiff makes broad and generalized claims of ownership, the Second Amended Complaint is completely

devoid of any factual allegations to support [] Plaintiff's conclusory assertion of ownership, or even to identify what property and natural resources [] Plaintiff claims to own." (*Id.* at 2). RGGS states that it owns the title to the coal and minerals Plaintiff appears to claim as its own: "RGGS purchased its title from [U.S.] Steel Corporation in 2004, and [U.S. Steel] conveyed the mineral estate to RGGS through two special warranty deeds" that have been recorded in the Jefferson County Probate Records since March 23, 2004.[8] (*Id.*). Further, RGGS joins with the other Defendants' motions, contending that Plaintiff's claim of ownership of the natural resources at issue "is the genesis of all of its claims," but that Plaintiff has utterly failed to state a plausible claim to that ownership. (*Id.* at 5–8, 8) ("Here, the Plaintiff has made no effort or attempt whatsoever to identify the lands, property, or minerals that it claims to own," and only "summarily asserts" ownership); (*Id.* at 8) ("Likewise, the Plaintiff has not alleged how it claims to have come to own the 'natural resources' . . . . This information is peculiarly within the Plaintiff's knowledge and control – only the Plaintiff knows what property and minerals it claims to own, and only the Plaintiff knows how it claims to have come to own" them). Thus, RGGS asserts, Plaintiff's Second Amended Complaint is groundless and speculative, and should be dismissed. (Doc. # 73 at 6–8, 11–13). RGGS argues too that, in any event, the Second Amended Complaint does not suggest racketeering activity or an antitrust conspiracy, but only the lawful conduct of a mineral owner (RGGS) and mine operators (Drummond and Twin Pines) lawfully engaged in the business of mining coal. (*Id.* at 9–11).

In its response, Plaintiff asserts that (1) RGGS failed to apply the controlling standard of review to "well-pled facts" that are "suggestive enough to render" Plaintiff's claims plausible, and (2) that Plaintiff's "well-pled facts have also created a reasonable expectation that discovery

---

[8] RGGS implies that, while it owned these mineral rights, it leased to Drummond and Twin Pines the mining operations. (Doc. # 73 at 12),

will reveal evidence of Plaintiff's *plausible* claim that the Defendants misappropriated [its] coal and timber."  (Doc. # 79 at 1–2) (emphasis in original).  In support of the latter statement, Plaintiff argues that RGGS has made "bald" assertions that can only be supported by discovery. (Doc. # 79 at 2–3).  And, Plaintiff contends that RGGS has failed to cite any controlling federal law requiring Plaintiff to describe in detail land boundaries and specific characteristics of natural resources; therefore, no such degree of specificity exists at this stage in federal court.  (*Id.* at 3–5).  "RGGS is trying to avoid the exact same result that other Defendants are trying to avoid: an opportunity to present expert reports and testimony on the *complex*, key issues regarding timber and coal rights, as well as land titles dating back to the 1850s."  (*Id.* at 4–5) (emphasis in original).  Plaintiff otherwise repeats the same arguments as in its other responses.  (*Id.* at 7–13).

In reply, RGGS contends that "Plaintiff does nothing to bolster, support, or clarify its allegations of ownership, but instead spends most of its effort in reciting the statutory or common law elements of the causes of action."  (Doc. # 82 at 2).   Again, RGGS cites to the other Defendants' replies as providing sufficient argument, but nonetheless specifically attacks Plaintiff's charge that RGGS makes "bald, naked assertions about ownership that can only be supported by documentation."  (*Id.* at 2 (citing Doc. # 79 at 2)).  RGGS asserts it has identified documents which establish its title (two special warranty deeds executed on February 26, 2004), and demonstrated that they are recorded with the Jefferson County Probate Records and contain detailed descriptions of the property conveyed to RGGS.  (*Id.* at 3).

### F.     Molpus's Dismissal Motion, or, Alternatively, Summary Judgment Motion

Molpus seeks dismissal under Rule 12(b)(6), or, alternatively, under Rule 56.[9]  (Doc. #

---

[9] Although Molpus submitted documents with its Motion, and alternatively moved under Rule 56, the court need not and does not convert the Motion into one for summary judgment.  Rather, the court will not consider the documents attached to Molpus's Motion.  *See* Fed. R. Civ. P. 12(d).

50).  It states its business is managing property owned by its clients, and that it manages property in Jefferson County for its client SWF.  (*Id.* at 2).  More specifically, Molpus avers that it has managed the harvesting of timber only on property where SWF either purchased timber rights from a U.S. Steel-owned entity or property that is owned in fee simple by SWF.  (*Id.*).  And, Molpus asserts, despite in-person meetings with Plaintiff and its attorneys, and despite requests from Defendants' counsel, Plaintiff has provided no information or documents identifying the property at issue or supporting Plaintiff's claim of a legal right to trees and minerals, "except for approximately six acres of land that serves as the homestead of Plaintiff's owner, Willie Haire."[10] (*Id.*).  Molpus further argues it neither cut trees on the six acres serving as Mr. Haire's homestead, and makes no claim to that property.  (*Id.* at 2–3).  Its Rule 12(b)(6) argument otherwise substantively mirrors the other Defendants' arguments: Plaintiff has not provided necessary factual allegations, has not provided a description of the property where the alleged theft of natural resources occurred, and has not alleged how it has a right to the timber that Molpus assisted in harvesting.  (*Id.* at 3, 6–10).

Plaintiff provided the same uniform response to Drummond, Molpus, and Twin Pines. (Doc. # 56).  Again, it need not be repeated.

In reply, Molpus argues that Plaintiff does not specifically address the argument that it provided conclusory statements as to ownership, which is insufficient for pleading, and does not address the failure to provide notice to Defendants as to where the alleged taking of resources occurred.  (Doc. # 67 at 5–6).  Instead, Molpus contends, Plaintiff recites the elements of the claims and ignores the arguments and legal authority cited by Defendants.  (*Id.*).

---

[10] Molpus reports that the court directed the parties to disclose information and documents pertaining to the property interests held by each party, as well as each party's business conduct in Jefferson County, but that Plaintiff has failed to do so.  (Doc. # 50 at 2–3).

## IV.    Standard of Review

The Federal Rules of Civil Procedure require that the complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Accordingly, the complaint must include enough facts "to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations.  *Twombly*, 550 U.S. at 555, 557.

In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party.  *Watts v. Fla. Intl. Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).  The court draws all "reasonable inferences" in favor of the plaintiff.  *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim.  *Twombly*, 550 U.S. at 556.

The Supreme Court has identified "two working principles" for a district court to use in applying the facial plausibility standard.  First, in evaluating motions to dismiss, the court must assume the veracity of well-pleaded factual allegations; however, the court does not have to

15

accept as true legal conclusions when they are "couched as [] factual allegation[s]." *Iqbal*, 556 U.S. at 678. Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* Application of the facial plausibility standard involves two steps. Under prong one, the court must determine the scope and nature of the factual allegations that are well-pleaded and assume their veracity; and under prong two, the court must proceed to determine the claim's plausibility given the well-pleaded facts. That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Id.* If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Id.*

## V.     Discussion

After careful review, and for the reasons stated below, the court concludes that while Plaintiff may have standing to assert its claims in this case, those claims are due to be dismissed.

### A.     Plaintiff's Standing

As a preliminary matter, some Defendants argue that Plaintiff has no standing to assert its claims. The court assumes without deciding that Plaintiff has standing here. "A plaintiff seeking to invoke a federal court's jurisdiction bears the burden of establishing standing." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1304 (11th Cir. 2004) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Standing stems from the "case" or "controversy" requirement of Article III, § 2 of the U.S. Constitution. *Id.* It has three constitutional elements that a plaintiff seeking to invoke a federal court's jurisdiction must show:

> (1) It has suffered an "injury in fact," that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  A failure to show any one of these elements "results in a failure to show standing."  *Koziara*, 392 F.3d at 1305 (citing *Lujan*, 504 U.S. at 560).

The court assumes without deciding that Plaintiff has standing to bring this case. Plaintiff alleges it owns land and certain natural resources that Defendants have wrongly taken and sold, causing Plaintiff to be economically harmed.  (*See* Doc. # 48).  But, as discussed below, it is not enough here for Plaintiff to show he has standing based on this set of facts. Plaintiff must still plead a plausible set of factual allegations that demonstrate he is entitled to relief.  *See Twombly*, 550 U.S. at 570.  For the reasons discussed below, Plaintiff has not done so (at least with respect to its federal law claims); therefore, Plaintiff's claims are due to be dismissed.

### B.    The Federal Law Damages Claims Are Due To Be Dismissed With Prejudice

The court determines that Plaintiff's RICO, Lanham Act, and Sherman Anti-Trust Act claims are due to be dismissed with prejudice.  It discusses each below in turn.

### 1.    Plaintiff's RICO Claims Are Due To Be Dismissed

Plaintiff avers that Defendants violated the federal civil RICO statute.  18 U.S.C. § 1964(c).  Section 1964(c) provides in relevant part that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."  18 U.S.C. § 1964(c).  However, Plaintiff does not specify which provisions of § 1962 Defendants have allegedly violated.

As a threshold matter, a successful RICO claim requires a plaintiff to establish the essential basics of a RICO enterprise as well as a "pattern of racketeering activity."  *Jackson v.*

*BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004).  A RICO enterprise exists "where a group of persons associates, formally or informally, with the purpose of conducting illegal activity."  *Id.* (quoting *United States v. Hewes*, 729 F.2d 1302, 1311 (11th Cir. 1984)). "Racketeering activity" includes certain predicate acts defined by statute.  18 U.S.C. § 1961(1)(B).  "A pattern is established by at least two acts of racketeering activity the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013) (quoting *McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 750 (11th Cir. 2000) (ellipsis in original)).  These predicate acts must be related to one another and demonstrate criminal conduct of a continuing nature.  *Jackson*, 372 F.3d at 1264.  Proximate causation is a RICO requirement.  *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992).

### a.      The Alleged Predicate Acts

Plaintiff contends that Defendants committed the following four predicate acts: (1) 18 U.S.C. § 1952 (interstate and foreign travel or transportation in aid of racketeering enterprises), (2) § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), (3) § 2314 (transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting), and (4) § 2315 (sale or receipt of stolen goods, securities, moneys, or fraudulent State tax stamps).  However, Plaintiff has provided nothing more than conclusory statements and recites the legal elements of these predicate acts.  (*See* Doc. # 48 at ¶¶ 51–57).  That type of pleading is due to be disregarded.  *See Iqbal*, 556 U.S. at 678. Stating a plausible claim for relief requires substantially more.

Moreover, and in any event, as a matter of law, Plaintiff cannot plead violations of predicate acts under §§ 1952, 1957, 2314, or 2315.  First, § 1952 requires the existence of an

"unlawful activity," defined in subsection (b) as certain specified activities that are not applicable here. *See* 19 U.S.C. § 1952(b). The definition of "unlawful activity" also includes "any act which is indictable . . . under section 1956 or 1957 of this title. . . ." *Id.* at § 1952(b)(i)(3). Section 1957 (which is another purported predicate act here) and Section 1956 both require the existence of statutorily defined "specified unlawful activity." *See* 18 U.S.C. §§ 1956(a)(1), 1957(a) ("Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally deprived property of a value greater than $10,000 and is derived from specified unlawful activity. . . ."). Section 1957 defines that term as having the meaning given to it by § 1956. 18 U.S.C. § 1957(f)(3). And, § 1956 defines "specified unlawful activity" as "any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 522 of tile 31," 18 U.S.C. § 1956(c)(7)(A), or in subsections (c)(7)(B)–(F). Few offenses listed in § 1961(1) are even arguably applicable here.

There are only two § 1961(1) "act[s] which are indictable" that even debatably could be relied upon here: Sections 2314 and 2315.[11] Taking these code sections in reverse order, under the scantly pleaded facts of this case, § 2315 cannot apply as a matter of law. Section 2315, in pertinent part, criminalizes the activity of "[w]hoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods . . . of the value of $5,000 or more, . . . *which have crossed a State or United States boundary **after** being stolen, unlawfully converted, or taken,* knowing the same to have been stolen, unlawfully converted, or taken. . . ." 18 U.S.C. § 2315 (emphases added). Here, the "goods" at issue were cut or mined within the state. There are no allegations that any receipt, possession, concealment, sale, or disposal of the "stolen" goods

---

[11] Sections 1952 and 1957 would apply only if Plaintiff can show the existence of a different "racketeering activity" under §§ 2314 or 2315.

occurred **after** the "stolen" goods crossed a state line. *See id*. (*See also* Doc. # 48). No Defendant is alleged to have received any of Plaintiff's natural resources after they crossed any state boundaries. (*See* Doc. # 48).

In addition, Plaintiff's § 2315 claim is subject to dismissal because Plaintiff has not alleged any plausible facts giving rise to an inference that Defendants knew they were stealing or unlawfully taking Plaintiff's resources. To the contrary, the "facts" as currently pleaded (and this is Plaintiff's third attempt) suggest, if anything, that Defendants took Plaintiff's resources with the understanding that, by virtue of right, title, dead, lease, and/or assignment, those resources rightfully belonged to them. Plaintiff has not made sufficient allegations to plausibly say that the resources were stolen, much less that Defendants knew the resources were stolen.

Thus, Plaintiff must be able to show that Defendants violated § 2314 to sustain any claim of a predicate act (be it under § 2314 or under §§ 1952 and 1957). Section 2314 in relevant part makes it illegal to "transport[], transmit[], or transfer[] in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud. . . ." 18 U.S.C. § 2314. This is where Plaintiff's averments regarding a predicate act unravel: Plaintiff has not and cannot plead the requisite knowledge element. First, its allegations concerning knowledge are conclusory statements and assumptions "couched as [] factual allegation[s]." *Iqbal*, 556 U.S. at 678. And, second, there is no way Plaintiff can demonstrate knowledge, or set up a reasonable expectation that discovery will lead to that knowledge, because more than one-and-a-half years after filing this case, Plaintiff itself does not even know where its property purportedly ends and Defendants' property rights begin. Indeed, the very core of this matter is to ask a court to make that determination—not to settle a concrete contested claim, but to obtain an answer in the first

instance.  If Plaintiff does not know its own property boundaries, it follows that Defendants would not and could not know that either.  Therefore, even if it is ultimately proved (in a forum other than this court) that Defendants did take Plaintiff's natural resources and sold them through the course of interstate commerce, it is a reasonable inference based upon Plaintiff's own set of allegations that Defendants' taking (and/or course of commercial activity) was done without the knowledge than any of the natural resources were stolen or converted.

Because Plaintiff cannot prove the elements of §§ 2314 or 2315, the line of definition-dominoes required to prove §§ 1952 and 1957 collapses.  Therefore, Plaintiff has not and cannot show any predicate acts necessary for a RICO claim, and its RICO claim is due to be dismissed.

### b.        The RICO Allegations Do Not Assert Any Plausible Claims

Plaintiff's failure to adequately plead any predicate act is only one of the fatal flaws from which the Second Amended Complaint suffers.  Even if Plaintiff had plausibly pled predicate act, its RICO claim is nevertheless due to be dismissed because Plaintiff has not specified which provision(s) of 18 U.S.C. § 1962 are at issue.  The court discusses each one in turn.

### 1)        18 U.S.C. § 1962(a)

Section 1962(a) provides in pertinent part that:

> [i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).  While the Eleventh Circuit has not pronounced a rule as to § 1962(a)'s application, it is clear that "the essence of a violation of § 1962(a) is not commission of predicate acts but investment of racketeering income."  *Gristede's Foods, Inc. v. Unkechauge Nation*, 532

F. Supp. 2d 439, 446 (E.D.N.Y. 2007) (quoting *Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990)); *see also Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1369 (M.D. Fla. 2005) ("a majority of courts that have addressed the issue have determined that a claimant under § 1962(a) must plead an injury which stems 'not from the racketeering predicate acts themselves' but from the 'use or investment of . . . racketeering income'") (collecting cases). Thus, the use or investment of racketeering income must proximately cause harm to the RICO victim. *See Lockheed Martin*, 357 F. Supp. 2d at 1369; *see also Nolen v. Nucentrix Broadband Networks Inc.*, 293 F.3d 926, 929 (5th Cir. 2002) ("any injury must flow from the *use or investment of racketeering income*" (emphasis in original) (quotation omitted)); *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 584 (5th Cir. 1992) (holding that there must be a nexus between the claimed violation and the injury).

Here, Plaintiff does not aver a single fact concerning the investment of alleged racketeering income. (*See* Doc. # 48). And, the well-pleaded fact pattern, however scant it may be, in no way suggests that the use or investment of any income derived from Defendants' purported racketeering activities are what proximately caused harm to Plaintiff. Thus, any claim under § 1962(a) is due to be dismissed.

### 2)      18 U.S.C. § 1962(b)

Section 1962(b) provides that "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b). "A violation of § 1962(b) requires that the RICO defendant acquire or maintain an interest in, or control of, an enterprise *through* (or by way of) the pattern of racketeering activity." *Advocacy Org. for Patients & Providers v.*

*Auto Club Ins. Assn.*, 176 F.3d 315, 328 (6th Cir. 1999) (citing *Compagnie De Reassurance D'Ile France v. New England Reins. Corp.*, 57 F.3d 56, 91–92 (1st Cir. 1995), *cert. denied*, 516 U.S. 1009 (1995); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1189–90 (3d Cir. 1993); *Danielsen v. Burnside-Ott Aviation Training Ctr.*, 941 F.2d 1220, 1230–31 (D.C. Cir. 1991)) (emphasis in original); *accord Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 276 F. Supp. 2d 1276, 1288 (S.D. Ga. 2003) (citation omitted) (same).  Stated otherwise, "§ 1962(b) prohibits a person engaging in a pattern of racketeering for the purpose of acquiring or maintaining an interest in an enterprise."  *Sadighi v. Daghighfekr*, 36 F. Supp. 2d 279, 291 (D. S.C. 1999). Plaintiff has not pleaded any facts concerning how Defendants maintained or acquired an interest in the alleged enterprise through any of the purported racketeering activities.  "Furthermore, [Plaintiff]'s RICO pleadings fail to 'allege a specific nexus between control of any enterprise and the alleged racketeering activity, as required under section 1962(b).'"  *Lightning Lube*, 4 F.3d at 1191 (quoting *Banks v. Wolk¸* 918 F.2d 418, 421 (3d Cir. 1990)) (other citations omitted). Instead, Plaintiff has set forth "formulaic recitations" and conclusory statements that this court rightfully disregards.  *Iqbal*, 556 U.S. at 678, 681.  Any Section 1962(b) claim is due to be dismissed with prejudice.

### 3)        18 U.S.C. § 1962(c)

Section 1962(c) states that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affair through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  To state a claim for relief under section 1962(c), a plaintiff must satisfy four elements: (1) conduct (2) of an

enterprise (3) through a pattern (4) of racketeering activity.  *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006).  Plaintiff does not successfully plead the four elements.

A RICO "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Plaintiff's allegations, at best, suggest that Defendants formed an enterprise that is an association-in-fact.  Of course, an association-in-fact enterprise "can exist in the absence of a formally structured group."  *Lockheed Martin*, 357 F. Supp. 2d at 1360 (quoting *United States v. Young*, 906 F.2d 615, 619 (11th Cir. 1990)).  However, not all associations-in-fact are RICO enterprises.  Instead, "[t]he critical determination in evaluating whether 'an association of individual entities' constitutes 'a RICO enterprise' is whether 'the association of individual entities, however loose or informal, furnished a vehicle for the commission of two or more predicate crimes.'"  *Id.* (quoting *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000)) ("*Goldin II*") (internal changes omitted).  In other words, the entities must be "associated together for the common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  Furthermore, an individual entity "must participate in the operation or management of the enterprise itself."  *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

Plaintiff's rudimentary allegation that Defendants formed an enterprise is simply not enough to survive a motion to dismiss.  A Defendant "'must have some part in directing' the affairs of the enterprise."  *Williams*, 465 F.3d at 1285 (quoting *Reves*, 507 U.S. at 179).  Yet here Plaintiff has not pleaded any plausible facts that permit an inference that any Defendant ran or helped run the alleged scheme.  Indeed, nothing in the Second Amended Complaint suggests that any Defendant directed another Defendant or its agents to take and sell Plaintiff's natural

24

resources.  And, even if some Defendants worked with others to establish a method of resource extraction (*e.g.*, one Defendant cleared the timber and then a mining company moved in), there are no facts to suggest that this working together furnished a vehicle to commit predicate crimes. Apart from mere legal conclusions, the Second Amended Complaint contains no allegations suggesting that Defendants "knew about and [much less] participated in the alleged enterprise." *McNair v. Macon Cty. Greyhound Park, Inc.*, No. 10-cv-560, 2011 WL 867220, at *8 (M.D. Ala. Mar. 14, 2011).  Plaintiff has failed to plead a cause of action pursuant to Section 1962(c), and that claim is due to be dismissed.

### 4)    18 U.S.C. § 1962(d)

Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).  Because Plaintiff has failed to state a claim for relief under §§ 1962(a), 1962(b), or 1962(c), it cannot, as a matter of law, support a cause of action pursuant to § 1962(d).

But, here there is even more.  Even if Plaintiff successfully pleaded a cause of action under §§ 1962(a), 1962(b), or 1962(c), it still has not alleged a claim under § 1962(d).  Plaintiff fails to aver any plausible facts demonstrating an illicit agreement between the Defendants to harm Plaintiff.  While a "defendant's participation in a conspiracy may be inferred from acts of his which furthered the objectives of the conspiracy," an unlawful agreement, including "knowledge of the essential nature of the plan," still must be pled to demonstrate the plausible existence of a conspiracy.  *United States v. Kopituk*, 690 F.2d 1289, 1323 (11th Cir. 1982) (citations and internal quotations omitted); *see also Twombly*, 550 U.S. at 557 ("without some further factual enhancement [an allegation of conspiracy] stops short of the line between possibility and plausibility of entitlement to relief") (internal changes and citations omitted).

Conclusory allegations, "accompanied by nothing more than a bare assertion of a conspiracy, do not plausibly suggest a conspiracy." *Am. Dental Assn. v. Cigna Corp.*, 605 F.3d 1283, 1294 (11th Cir. 2010). "[W]ithout that further circumstance pointing to a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Twombly*, 550 U.S. at 557.

Here, Plaintiff has "merely alleged," as part of its RICO claims, that Defendants conducted their relationship in a manner that harmed Plaintiff and deprived it from its accessing or selling natural resources. *Club Car*, 276 F. Supp. 2d at 1284. But Plaintiff's RICO claims fall far short of identifying any agreement made between Defendants to engage in RICO-prohibited behavior. Rather, Plaintiff's pleading have only made conclusory statements and assumptions "couched as [] factual allegation[s]." *Iqbal*, 556 U.S. at 678. Plaintiff has simply not alleged facts to show a valid RICO violation. Accordingly, that claim is due to be dismissed.

### 2.      Plaintiff's Lanham Act Allegations Are Not Plausible

Count VII of Plaintiff's Second Amended Complaint alleges a cause of action against all Defendants pursuant to Section 43 of the Lanham Act, codified as 15 U.S.C. § 1125. (Doc. # 48 at ¶¶ 80–87). Although "Congress enacted the Lanham Act [] seven decades ago, . . . . it 'requires no guesswork' to ascertain Congress' intent regarding [it], for Congress included a 'detailed statement of the statute's purposes.'" *POM Wonderful LLC v. Coca-Cola, Co.*, 134 S. Ct. 2228, 2233 (2014) (quoting *Lexmark Intl. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014) (citing 60 Stat. 427 (1946))). Indeed, Section 45 of the Lanham Act provides:

> The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproduction, copies, counterfeits, or colorable imitations of registered

marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. § 1127. "The Lanham Act's trademark provisions are the primary means of achieving these ends. But the Act also creates a federal remedy 'that goes beyond trademark protection.'" *POM Wonderful*, 134 S. Ct. at 2234 (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 538 U.S. 23, 29 (2003)). According to Plaintiff, "Black Diamond is an unregistered but registerable trademark used by Plaintiff in connection with its" natural resources "regarding monetizing" them, and Plaintiff claims it "has been damaged by Defendants' false statements about Plaintiff's goods and/or services." (Doc. # 48 at ¶¶ 84–85). Thus, "[t]he broader remedy is at issue here." *POM Wonderful*, 134 S. Ct. at 2234.

"'Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition' in interstate commerce, and 'forbids unfair trade practices involving infringement of . . . trademarks, even in the absence of federal trademark registration.'" *Custom Mfg. & Engg., Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (quoting *Univ. of Fla. v. KPB, Inc.*, 89 F.3d 773, 775-76 (11th Cir. 1996) (*per curiam*)); *see also POM Wonderful*, 134 S. Ct. at 2234 ("The Lanham Act creates a cause of action for unfair competition through misleading advertising or labeling."). Section 43(a) provides in pertinent part:

> (1) Any person who, or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  "Section 1125(a) thus creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."  *Lexmark*, 134 S. Ct. at 1384.  Plaintiff alleges Defendants are liable under both theories.  (Doc. # 48 at ¶¶ 80–83).  The court disagrees.

Plaintiff's claim fails because it has not plausibly pled a violation of Section 43(a).  Even in its third pleading, there simply are not enough well-pleaded factual allegations to determine the origin, nature, and quality (among other things) of the timber and coal products being marketed and sold by Defendants, or whether Plaintiff has a viable claim as to the ownership of those natural resources.  *See Twombly*, 550 U.S. at 555 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (internal citations omitted and changes in original).  Nor are there allegations concerning the contents of any advertisements by Defendants.  *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (setting forth elements of false advertising claim).  To be sure, Plaintiff has made statements generally averring Lanham Act violations.  But these allegations are conclusory, "formulaic recitations," and the court disregards them.  *Iqbal*, 556 U.S. at 678, 681.  For example, Plaintiff asserts that "Black Diamond" is an "unregistered but registerable trademark used by Plaintiff in connection with its coal, coal reserves, and/or good and/or services regarding monetizing the coal reserves.  The same goes for the timber at issue in

this case." (Doc. # 48 at ¶ 84). What Plaintiff has not set forth is any factual allegation that it uses or has used the name "Black Diamond" (or anything similar) in commerce. Similarly, it has not set forth any plausible facts suggesting Defendants' use of advertisements, statements, logos, or otherwise, has or is likely to cause customer confusion. *See Custom Mfg.*, 508 F.3d at 647 ("the touchstone of liability is . . . whether such use is likely to cause consumer confusion"). Likewise, there are no facts supporting claims of false statements by Defendants in connection with the sale of the products that Plaintiff avers are its own—only conclusory statements. (*See, e.g.*, Doc. # 48 at ¶¶ 19–20). Simply put, Plaintiff is now on its third attempt but has utterly failed to allege plausible facts in support of a claim for violation of Section 43. That claim is due to be dismissed with prejudice.[12]

### 3.    Plaintiff's Sherman Act Claims Are Due To Be Dismissed

In Count IV of the Second Amended Complaint, Plaintiff alleges that Drummond and Twin Pines violated the Sherman Act—specifically, 15 U.S.C. §§ 2–3. Title 15 U.S.C. § 15(a) provides that "any person who shall be injured in his business or property by reason of anything

---

[12] Moreover, although Plaintiff argues that *Alvion Properties, Inc. v. Weber*, No. 08-cv-0866, 2012 WL 4849891 (M.D. Tenn. Oct. 11, 2012), *report and recommendation adopted*, 2012 WL 5830591 (M.D. Tenn. Nov. 16, 2012), supports its position, that case is distinguishable. In *Alvion*, the court denied summary dismissal of the plaintiffs' claim that the defendants violated Section 43(a) by making false statements regarding "the origination of coal, coal reserves and/or goods and/or services regarding monetizing the coal reserves," and "defendants' affiliation or connection with plaintiffs in their attempts to advertise, promote, sell or license plaintiffs' coal, coal reserves, or other goods or services." 2012 WL 4849891, at *1. The defendants' summary judgment motion focused on the facts that the corporate plaintiff, Alvion, was long-dormant, never had goods or services in commerce, and never had a registerable trademark. *Id.* at *2-3. Central to that court's ruling was that the defendants read the Lanham Act too narrowly. *Id.* at *3. To be sure, Plaintiff is similar to Alvion in that it claims "desires to enter the Alabama and world markets in which coal and timber are resourced in Alabama and then marketed and sold for profit," and it does not have a registered trademark. (Doc. # 48 at ¶¶ 45, 84). But, the *Alvion* court's opinion does not include a discussion of the allegations and facts of that case, which, when analyzed, plainly demonstrate the difference between *Alvion* and this case. In addition, in *Alvion* there was no dispute that the plaintiff corporation *owned the coal reserves* at issue. *See generally Alvion*, No. 08-cv-866 (Docs. # 26, 609). There, the coal reserves were alleged to have been assigned to some of the defendants and then falsely marketed under the defendants' names. *See id.* Here, the entire dispute revolves around who *actually owns* the coal and timber reserves at issue, without any plausible facts averred by Plaintiff that might allow the court or Defendants to determine a basis for Lanham Act liability, or discovery on that claim. Rather, Plaintiff makes rote statements of law alleging Lanham Act violations copied almost *verbatim* from the *Alvion* pleadings. *Compare id.* (*See* Doc. # 48).

forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent. . . ."  The court addresses Plaintiff's §§ 2 and 3 claims in reverse order.[13]

### a.       15 U.S.C. § 3

The court will address Plaintiff's § 3 claims first.  Section 3 sets forth in relevant part:

(a) Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . between any such Territory or Territories [of the United States] and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States, or foreign nations, is declared illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a felony . . . .

(b) Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce . . . between any such [Territory or Territories of the United States] and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia, and any State or States or foreign nations, shall be deemed guilty of a felony. . . .

15 U.S.C. § 3.  By its plain language, § 3 is inapplicable to this case because Alabama is clearly one of the fifty States of the Union—it is not a United States Territory nor the District of Columbia.  *See, e.g.*, *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999) ("The starting point for all statutory interpretation is the language of the statute itself."); *see also United States v. Standard Oil Co. of Cal.*, 404 U.S. 558 (1972) (*per curiam*) ("Section 3 extends to 'any Territory of the United States,'" including organized and unorganized territories and insular dependencies), *rehearing denied* 405 U.S. 969; *United States v. Am. Med. Assn.*, 110 F.2d 703, 713 (D.C. Cir. 1940) (Congress intended with 15 U.S.C. § 3 to apply Sherman Act to District of

---

[13] Although each of these sections provides for criminal sanctions, aggrieved parties may also bring a civil action for violations of these code sections.  *See* 15 U.S.C. § 15(a).

Columbia), *cert. denied* 308 U.S. 599, *cert. denied* 310 U.S. 644.  Thus, as a matter of law, Plaintiff's § 3 claim does not state any claim for relief.[14]

### b.   15 U.S.C. § 2

Section 2 provides in pertinent part that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations shall be deemed guilty of a felony. . . ."  15 U.S.C. § 2.  Section 2 covers both concerted and independent actions, but only if those actions "monopolize[]," or "threaten[] actual monopolization."  *Am. Needle, Inc. v. Natl. Football League*, 560 U.S. 183, 190 (2010) (quoting 15 U.S.C. § 2, *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984)).

Here, Plaintiff pleads that Twin Pines and Drummond attempted to conspire and create a concerted monopoly.  (Doc. # 48 at ¶¶ 68–72).  To state an attempted monopolization claim the plaintiff must plead facts that show: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). "The intent and dangerous probability elements are related, as a plaintiff must show intent to monopolize to establish that there is a dangerous likelihood of monopolization."  *Clark Memorials of Ala. Inc. v. SCI Ala. Funeral Servs. LLC*, 991 F. Supp. 2d 1151, 1157 (N.D. Ala. 2014) (citing *Swift & Co. v. United States*, 196 U.S. 375, 396 (1905)).

The starting point for an attempted monopolization claim is an analysis of monopoly power.  *Clark Memorials*, 991 F. Supp. 2d at 1157.  To sustain an attempted monopolization claim, a plaintiff must allege that "the defendant comes close to achieving monopoly power in

---

[14] In any event, even if § 3 were applicable in this case, Plaintiff has not set forth any plausible factual allegations that would allow the court to infer a violation of the Sherman Act.

the relevant market." *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 721 F.3d 1281, 1285 (11th Cir. 2013). The court is called upon to undertake a two-step analysis to determine whether there is monopoly power.

Step one requires the court to define the relevant market, "which has both product and geographic dimensions." *Gulf States Reorganization*, 721 F.3d at 1285. The geographic boundary "is the area in which the product or its reasonably interchangeable substitutes are traded," and includes certain corroborative factors. *T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991). The product market "is defined in part by whether a group of manufacturers, because of the similarity of their products, have the ability— actual or potential—to take significant amounts of business away from each other." *Gulf States Reorganization*, 721 F.3d at 1286 (internal quotation marks omitted). "A well-pleaded market allows the Court to determine that it is plausible 'a monopolist, cartel, or oligopoly in that market would be able to reduce marketwide output simply by cutting its own output, and thereby raise marketwide prices above competitive levels.'" *Clark Memorials*, 991 F. Supp. 2d at 1158 (quoting *U.S. Anchor Mfg., Inc. v Rule Indus., Inc.*, 7 F.3d 986, 995–96 (11th Cir. 1993)).

Step two requires a determination of market share. "The principal measure of actual monopoly power is market share, and the primary measure of the probability of acquiring monopoly power is the defendant's proximity to acquiring a monopoly share of the market." *U.S. Anchor Mfg.*, 7 F.3d at 999. In other words, "the alleged monopolist must possess enough power or potential power in th[e] 'relevant market' in order to harm competition." *Spanish Broadcasting Sys. of Fla., Inc. v. Clear Channel Commcns., Inc.*, 375 F.3d 1065, 1074 (11th Cir. 2004) (citation omitted). A low market share may preclude an attempted monopolization claim.

*See Yoder Bros., Inc. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1347, 1368–69 (5th Cir. 1976)[15] (finding that 20% market share in defined ornamental plant market was low enough to support a finding of no attempted monopolization).

Although Plaintiff claims that Drummond and Twin Pines are liable for attempted monopolization, it has failed to plead those facts necessary to even make a *prima facie* showing of attempted monopolization—concerted or independent. First, showing concerted action "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. To the contrary, here, Plaintiff only makes a conclusory statement that Drummond and Twin Pines "are working in concert" in a conspiracy to deprive it from its alleged coal. (Doc. # 48 at ¶ 68). Such a conclusory statement does not provide "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. The well-pleaded facts in Plaintiff's Second Amended Complaint, taken as true, demonstrate only this: two independent coal extraction companies extracted coal from land that Plaintiff claims to own. These well-pleaded facts, at best, suggest a case of mere parallel conduct by Drummond and Twin Pines. "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 556–57. Indeed, "[e]ven 'conscious parallelism,' a common reaction of 'firms in a concentrated market [that] recognize[e] their shared economic interests and their interdependence with respect to price and output decisions,' is 'not in itself unlawful.'" *Id.* at 553–54 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)) (changes in *Twombly*) (other citations omitted). Plaintiff has pleaded no facts that plausibly demonstrate an agreement or conspiracy, and thus

---

[15] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 12065, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

has not rais[e]d a reasonable expectation that discovery will reveal evidence of illegal agreement."[16]  *Id.* at 556.  A concerted attempted monopolization claim cannot stand.

The court's analysis does not end here.  Plaintiff has also failed to plead an independent attempted monopolization claim.  "The conduct of a single firm is governed by § 2 alone and is unlawful only when it threatens actual monopolization.  It is not enough that a single firm appears to 'restrain trade' unreasonably, for even a vigorous competitor may leave that impression."  *Copperweld*, 467 U.S. at 767.  Indeed, "[i]n part because it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization."  *Id.* at 767-68.  Congress so established Section 2 to "reduce[] the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur."  *Id.* at 768.  Congress also sought to "avoid[] judicial scrutiny of routine, internal business decisions."  *Am. Needle*, 560 U.S. at 190.

The pleadings are devoid of allegations concerning the relevant market.  Indeed, the closest averment in this respect is that Drummond and Twin Pines have "attempt[ed] to monopolize coal commerce within and outside the State of Alabama."  (Doc. # 48 at ¶ 68).  If that statement truly reflects the purported relevant market, then it ignores other players in coal commerce within and outside Alabama, including some of the largest coal companies in the

---

[16] Quite similarly, Plaintiff has not pleaded any plausible facts demonstrating specific intent by either Drummond or Twin Pines to attempt to monopolize any market (outside the course of normal business competition), or to keep Plaintiff from entering a coal market. Further, and in any event, again in reality, this case alleges a simple property dispute.  No party argues that Plaintiff does not own land with possible natural resources on and under that land.  Even if Drummond was at one point interested in exploring under Plaintiff's property, such interest is not unusual for a company that mines coal—especially if Plaintiff's land is located near other mining sites.  But, a past fleeting interest (or even one that is ongoing) in the possibility of extracting coal does not an attempted monopolization make.

United States.[17]  In addition, there are no allegations regarding market share.  Without any facts concerning a relevant market or market share, there is no way for Plaintiff to demonstrate monopoly power or attempted monopolization, and it is simply not reasonable to expect that discovery will reveal facts supporting either of the two theories.  Plaintiff's Sherman Act claims are therefore due to be dismissed with prejudice.

### C.     The Declaratory Judgment Request Has No Independent Jurisdictional Basis

Plaintiff has also requested a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 concerning its property ownership rights and privileges to natural resources at issue.  (Doc. # 48). "Of course, it is well established that the Declaratory Judgment Act does not, of itself, confer jurisdiction upon federal courts."  *Stuart Weitzman, LLC v. Microcomputer Res., Inc.*, 542 F.3d 859, 861–62 (11th Cir. 2008) (citations omitted); *see also Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 849 (2014) ("We have long considered 'the operation of the Declaratory Judgment Act' to be only 'procedural,' leaving 'substantive rights unchanged.'" (internal and other citations omitted)).   "If there is an underlying ground for federal court jurisdiction, the Declaratory Judgment Act 'allow[s] parties to precipitate suits that otherwise might need to wait for the declaratory relief defendant to bring a coercive action.'"  *Household Bank v. JFS Grp.*, 320 F.3d 1249, 1253 (11th Cir. 2003) (quoting *Gulf States Paper Corp. v. Ingram*, 811 F.2d 1464, 1467 (11th Cir. 1987), *abrogated on other grounds by King v. St. Vincent's Hosp.*, 502 U.S. 215, 217 (1991)) (change in *Household*).   Stated otherwise, the "inquiry is thus 'whether, absent the availability of declaratory relief, the instant case could nonetheless have been brought in federal court.  To do this, we must analyze the assumed

---

[17] The court need not abandon common sense or its judicial experience in assessing Plaintiff's allegations. *Iqbal*, 556 U.S. at 678.  Other coal extraction companies were active in this court's jurisdiction during the timeframe alleged by Plaintiff.  A prime example is Walter Energy, Inc., which has not been named as a defendant or even mentioned by Plaintiff, yet was a well-known, large, coal mining company in northern Alabama during the times relevant here.

coercive action by the declaratory judgment defendant.'"   *Stuart Weitzman*, 542 F.3d at 862 (quoting *Gulf States Paper*, 811 F.2d at 1467) (additional citation omitted).   "Federal question jurisdiction 'exists in a declaratory judgment action if the plaintiff has alleged facts in a well-pleaded complaint which demonstrate that the defendant *could* file a coercive action arising under federal law."   *Id.* (quoting *Household Bank*, 320 F.3d at 1251) (emphasis in *Stuart Weitzman*).

Here, the court has determined that Plaintiff's federal law claims under the Sherman Act, Lanham Act, and RICO are all due to be dismissed, leaving only a Declaratory Judgment Act claim and state law claims.   The parties are not completely diverse.   Accordingly, on the face of the Second Amended Complaint, there is no independent basis for federal jurisdiction.

Furthermore, looking deeper, the court determines that Plaintiff has not alleged facts that demonstrate Defendants could file a coercive federal law action.   (*See* Doc. # 48).   The central issues of this case concern the ownership rights of land and minerals.   The parties may have a genuine dispute about those rights.   But these issues are of the type appropriately decided under *state*, not federal laws.   This court lacks a jurisdictional basis to issue any of the relief sought by Plaintiff.   Therefore, the declaratory judgment claim (Count VI) is due to be dismissed without prejudice.

### D.       The State Law Claims Are Due To Be Dismissed Under 28 U.S.C. § 1367(c)

Federal courts are courts of limited jurisdiction.   *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).   Courts "possess only that power authorized by Constitution and statute."   *Id.* (citations omitted).   Accordingly, a district court may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original

jurisdiction that they form part of the same case or controversy under Article III."  28 U.S.C. § 1367(a).

However, under § 1367(c)(3), a district court may appropriately discontinue its exercise of supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction."   The Eleventh Circuit has recognized this principle and strongly encouraged dismissal of pendent state claims in circumstances such as this:  "Once any of these factors [in section 1367(c)] is satisfied, the district court possesses the discretion to dismiss supplemental claims and must 'weigh . . . at every stage of the litigation,' whether to dismiss the supplemental claims."  *Ameritox, Ltd. v. Millennium Labors., Inc.*, 803 F.3d 518, 532 (11th Cir. 2015) (citation omitted).   "Indeed, if the federal claims are dismissed prior to trial, [the Supreme Court] strongly encourages or even requires dismissal of the state claims."  *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)) (other citations omitted).

Furthermore, when determining whether to dismiss claims, a court should consider factors such as "judicial economy, convenience, fairness, and comity."  *Id.*  "Another important consideration . . . is the running of a state statute of limitation."  *Ingram v. School Bd. of Miami-Dade Cty.*, 167 Fed. Appx. 107, 109 (11th Cir. 2006) (citing *L.A. Draper*, 735 F.2d at 428).

As the court has determined above, Plaintiff's federal law damages claims—its basis for this court's original jurisdiction—are all due to be dismissed for failure to state a claim.   It follows that Plaintiff's declaratory judgment cause of action is due to be dismissed without prejudice because no other independent basis for federal jurisdiction exists in this case.  Without the federal law claims in this case, only Plaintiff's state law causes of action remain.  "When a court decides not to exercise supplemental jurisdiction under § 1367(c)(3) because only state

claims remain, the proper action is a dismissal without prejudice so that the complaining party may pursue the claim in state court." *Ingram v. School Bd. of Miami-Dade Cty.*, 167 Fed. Appx. 107, 109 (11th Cir. 2006) (citing *Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir. 1999)).  "State courts, not federal courts, should be the final arbiters of state law." *Baggett v. First Natl. Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997) (citation omitted).  In this case, the parties' remaining state law claims are best resolved by the Alabama courts.  "This is especially true here where the Court [has] dismiss[ed] Plaintiff['s] federal law claim[s] prior to trial," and when discovery on the supplemental claims has made little progress.  *Id.* (citations omitted). Accordingly, the court in the interests of comity and judicial economy declines to continue exercising supplement jurisdiction over those claims.

The court must also consider the statute of limitations applicable to the supplemental claims prior to ordering dismissal for refiling in state court.  *See Ingram*, 167 Fed. Appx. at 109. After undertaking this examination, the court concludes dismissal will not disadvantage Plaintiff. Indeed, even if the statute of limitations may have run on some or all of its state law claims asserted in this case, a federal statute tolls the claims during the pendency of this action and for a period of thirty days after it is dismissed.  *See* 28 U.S.C. § 1367(d); *see also Lewis v. DeKalb Cty. Bd. of Educ.*, No. 11-cv-2627, 2013 WL 6073519, at *8 (N.D. Ala. Nov. 18, 2013) (citing 28 U.S.C. § 1367(d); *Weinrib v. Duncan*, 962 So.2d 167, 169 (Ala. 2007) (holding that plaintiff has thirty days to refile state-law claim in state court after federal court's entry of order of dismissal)) (other citations omitted); *Rester v. McWane, Inc.*, 962 So.2d 183, 186-87 (Ala. 2007).

For all these reasons, Plaintiff's state-law claims are due to be dismissed under 28 U.S.C. § 1367(c)(3).

## VII.    Conclusion

For the reasons stated above, the court concludes that Defendants' Motions (Docs. # 49, 50, 51, 59, 73, 76) are due to be granted in part as to Plaintiff's federal claims.  Plaintiff's state law claims are due to be dismissed under 28 U.S.C. § 1367(c).  The court will enter a separate order of dismissal.

**DONE** and **ORDERED** this July 6, 2016.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE